## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| E.Y., a Minor, by his Mother and<br>Next Friend, TENILLE WALLACE,<br>and TENILLE WALLACE, Individually, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 10-CV-7346 |
| vs. | ) | Judge Robert W. Gettleman |
| | ) | Magistrate Judge Sidney I. Schenkier |
| THE UNITED STATES OF AMERICA,<br>UNIVERSITY OF CHICAGO MEDICAL<br>CENTER d/b/a UNIVERSITY OF CHICAGO<br>HOSPITALS, a corporation, CATHERINE<br>HARTH, M.D., KENNETH R. MACEK, M.D.,<br>NATASHA JENKINS, M.D., SAROSH RANA,<br>M.D., KRISTINE WROBLEWSKI, R.N., and<br>SHERLEY MCCLAIN, R.N., | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

This case involves a claim of medical malpractice that centers on the care provided prior to and during the delivery and birth of plaintiff, E.Y. Presently pending before the Court is a motion filed by defendant, University of Chicago Medical Center ("UCMC"), pursuant to the Hospital Licensing Act ("HLA"), 210 ILCS 85/6.17, to conduct *ex parte* interviews of three physicians – Dr. Erika Claud, Dr. Charles Marcucelli and Dr. Michael Kohrman – for the purpose of preparing them for "any discovery deposition which they are asked to give" (doc. # 54: Def.'s Mot., ¶ 5). Each of these physicians provided medical treatment to E.Y. sometime between April 4, 2005 and April 27, 2005, after the birth of E.Y. None of these three physicians is named as a defendant, and none of plaintiff's allegations in this case challenges any of their conduct.

Plaintiffs, the minor E.Y, with his mother, Tenille Wallace (as next friend and individually), oppose this motion on grounds that the HLA does not permit the requested *ex parte* interviews, because the doctors UCMC wishes to interview are not agents or employees of defendant UCMC (Pls.' Resp. at 7). Alternatively, plaintiffs argue that, even if this Court interprets the amended HLA to permit such *ex parte* communications, the statute gives this Court discretion to "regulate the discovery process" in the interest of "justice," and that the Court should exercise that discretion to forbid at least one of the requested *ex parte* interviews.

For the reasons given below, the Court grants in part and denies in part the defendant's motion to conduct *ex parte* interviews. We conclude that UCMC may speak *ex parte* with Drs. Claud and Marcucelli, who no longer treat E.Y., for the purpose of preparing them for any future depositions. However, we conclude that UCMC may not speak *ex parte* with Dr. Kohrman, who continues to treat E.Y. to this day.

## I.

The parties cite only Illinois statutory and case law in connection with their respective arguments. Thus, although they do not expressly say so, it appears that the parties agree that Illinois law governs the issue presented in this motion.

We begin our discussion of the relevant Illinois law with the "*Petrillo* doctrine," announced in *Petrillo v. Syntex Labs, Inc.*, 499 N.E.2d 952 (Ill. App. Ct. 1986). In that case, plaintiffs alleged that they were injured from consuming formulas defendant produced and distributed. During discovery, an attorney representing defendant engaged in *ex parte* discussions with Dr. Tomasi, one of Petrillo's treating physicians. The trial court barred defense counsel from engaging in further *ex parte* discussions with any of plaintiffs' treaters. Defense counsel later informed the trial court that

he planned to have *ex parte* communications with Dr. Green, a treating physician for another plaintiff. The trial court held defense counsel in contempt, an order that was then appealed.

The appellate court affirmed the trial court's order. The court "strongly disagree[d]" with defense counsel's argument that "there is no public policy prohibiting *ex parte* conferences" with plaintiffs' doctors. *Petrillo*, 499 N.E.2d at 956. To the contrary, the appeals court stated that "modern public policy strongly favors the confidential and fiduciary relationship existing between a patient and his physician," and that "*ex parte* conferences between defense counsel and a plaintiff's treating physician jeopardize the sanctity of the physician-patient relationship and, therefore, are prohibited by public policy." *Id.* at 957. The court found further support for that conclusion in "the fact that no appreciative gain (regarding the evidence to be obtained) can be had through such meetings," *id.*, since any information obtained through an *ex parte* discussion also could be secured through "conventional methods of discovery." *Id.* at 956.

Central to the *Petrillo* court's analysis was the concern that the confidential relationship between the patient and the physician would be undermined if the physician were able to disclose information to a third party (in that case, Syntex's counsel) without patient consent. The appellate court explained that "at the very minimum, the confidential relationship existing between a patient and physician demands that information confidential in nature remain, absent patient consent, undisclosed to third parties. If such were not the case, then no confidentiality between a patient and his physician in fact would exist." *Petrillo*, 499 N.E.2d at 959.

Subsequent decisions recognized that the *Petrillo* doctrine did not create an absolute prohibition in all circumstances of *ex parte* communications between defense counsel and a plaintiff's treater. For example, in *Morgan v. County of Cook*, 625 N.E.2d 136 (Ill. App. Ct. 1993),

defense counsel had engaged in *ex parte* communications with Dr. Hall, a physician who had treated plaintiff. Although Dr. Hall was not a defendant in the case, plaintiff was attempting to hold the defendant hospital liable for his alleged conduct. On plaintiff's motion, the trial court had barred the trial testimony of Dr. Hall on the ground that the *ex parte* communication violated the *Petrillo* doctrine.

The appellate court reversed, holding that "when a patient seeks to hold a hospital vicariously liable for the conduct of a physician-employee, the hospital is entitled to speak *ex parte* with that physician." *Morgan*, 625 N.E.2d at 139. The court stated that its decision was not "contrary to the *Petrillo* court's underlying reasoning." *Id.* at 140. Where a plaintiff seeks to hold the defendant hospital responsible for the conduct of his treater, the hospital is not a third party to the plaintiff's relationship with his treater, as was true of defendant corporation in *Petrillo*. Rather, "the defendant hospital is included within the physician-patient privilege and the patient has impliedly consented to the release of his medical information to the defendant hospital's attorneys." *Id.*

Moreover, since plaintiff was attempting to hold the defendant hospital responsible for Dr. Hall's conduct, when Dr. Hall spoke with the defense counsel for the hospital he "was not speaking *to* plaintiff's legal adversary so much as he *was* plaintiff's legal adversary." *Morgan*, 625 N.E.2d at 141 (emphasis in original). Accordingly, the appellate court held that a patient's confidentiality interest in "medical information the physician may have learned during his allegedly negligent treatment" of the patient does not outweigh the hospital's "right to effectively defend itself and to unfettered communication 'with the physician for whose conduct the hospital is allegedly liable.'" *Id.* at 142.

Several years after *Morgan*, on January 1, 2000, Illinois enacted the HLA, 210 ILCS 85/6.17.

As relevant here, the HLA as originally enacted states as follows:

 (b)  all information regarding a hospital patient gathered by the hospital's medical staff and its agents and employees shall be the property and responsibility of the hospital and must be protected from inappropriate disclosure as provided in this section . . . .

 (d)  *no member of a hospital medical staff and no agent or employee of a hospital shall disclose the nature or details of services provided to patients, except that the information may be disclosed to* the patient, persons authorized by the patient, the party making treatment decisions, if the patient is incapable of making decisions regarding the health services provided, those parties directly involved with providing treatment to the patient or processing the payment for that treatment, *those parties responsible for peer review, utilization review, quality assurance, risk management or defense of claims brought against the hospital arising out of the care,* and those parties required to be notified under the Abused and Neglected Child Reporting Act, the Illinois Sexually Transmitted Disease Control Act, or where otherwise authorized or required by law.

 (e)  *the hospital's medical staff and the hospital's agents and employees may communicate, at any time and in any fashion, with legal counsel for the hospital concerning the patient medical record privacy and retention requirements of this section and any care or treatment they provided or assisted in providing to any patient within the scope of their employment or affiliation with the hospital.*

210 ILCS 85/6.17(b), (d), (e) (emphasis added).

The highlighted portions of subsections (d) and (e) squarely permit counsel for a hospital to communicate with the hospital's agents or employees about the medical care they provided to a patient. In *Burger v. Lutheran Gen. Hosp.*, 759 N.E.2d 533 (Ill. 2001), the Illinois Supreme Court squarely rejected the argument that in so doing, subsections (d) and (e) of the HLA violate a patient's right of privacy in his or her medical information.

*Burger* involved a suit against a hospital and others for alleged malpractice that resulted in the amputation of a leg at the knee. Plaintiff asked the trial court to bar the hospital's counsel from having *ex parte* communications with members of the hospital's medical staff, agents and employees who provided care to plaintiff but who were not named as defendants. The trial court held that, to the extent that subsections (d) and (e) authorized the hospital's counsel to have *ex parte* communications with treaters whose conduct did not form the basis of a claim that the hospital was vicariously liable, those subsections of the HLA were unconstitutional.

The Supreme Court reversed, stating that "[t]he limited intrahospital communications allowed pursuant to subsections (d) and (e) in order to assure quality patient care do not unreasonably invade a hospital patient's expectation of privacy." *Burger*, 759 N.E.2d at 552. The Supreme Court reasoned that, "[i]n light of the reality of contemporary hospital operations, we conclude that a hospital patient could not reasonably expect a member of the hospital's medical staff, or the hospital's agents and employees, to refrain from discussing, within the narrow parameters set forth in subsections (d) and (e) of section 6.17 of the Act, the medical care provided to the patient with the hospital, which is ultimately responsible for the patient's care." *Id.* The Supreme Court observed that the information being communicated was already known to the hospital and its counsel (at least constructively), since subsection (b) of the HLA states that " all information regarding a hospital patient gathered by the hospital's medical staff and its agents and employees shall be the property" of the hospital. *Id.* at 553. The *Burger* court also stated that, while it found the rationale of *Petrillo* to be "sound," *id.* at 554, subsections (d) and (e) did not contravene that rationale because "[t]he hospital is not a third party with respect to its own medical information, which is compiled by the hospital's own caregivers." *Id.* at 555. Building on this holding, the Supreme Court

6

explained that a patient who files a lawsuit "cannot validly claim any greater expectation of privacy after the lawsuit is filed than prior to its filing." *Burger*, 759 N.E.2d at 555.

The *Burger* court also rejected a separation of powers challenge to subsections (d) and (e). The Supreme Court held that those subsections do not "infringe upon the . . . court's inherent powers to manage the orderly discovery of information during litigation," and that the trial court "retains full authority to enter protective orders, where appropriate," in connection with communications under subsections (d) and (e)." *Burger*, 759 N.E.2d at 549.

Relying on the analysis in *Burger*, subsequent decisions by Illinois appellate courts interpreted subsections (d) and (e) to mean that, "after a medical negligence case has been filed against a hospital, the defendant hospital's counsel . . . may communicate *ex parte* with the plaintiff's non-Morgan health care providers who, in the course of their employment or affiliation with the defendant hospital, provided or assisted in providing care or treatment to the plaintiff." *In re Medical Malpractice Cases*, 787 N.E.2d 237, 244 (Ill. App. 2003); *see also Hall v. Flowers,* 798 N.E.2d 757 (Ill. App. 2003) (following *In re medical Malpractice Cases*). The term "non-Morgan health care providers" refers those providers who, unlike the situation presented in the *Morgan* case, are not care providers for whom a plaintiff seeks to impose vicarious liability on the hospital. At the same time, seizing on the language in *Burger* concerning a court's authority to manage discovery, the *In re Medical Malpractice Cases* court added that "the fact that such post-litigation intrahospital communications are allowed by statute in no sense diminishes the power of the . . . court to regulate the discovery process during litigation and to enter protective orders when, under the particular circumstances of any given case, justice may so require." 787 N.E.2d at 244.

## II.

If the development of Illinois law on this issue had stopped here, we would have no doubt that subparts (d) and (e) of the HLA, as interpreted by the Illinois courts, permit the *ex parte* interviews that UCMC seeks. The three doctors in question all are non-*Morgan* health care providers: they rendered treatment to E.Y. shortly after birth, while affiliated with UCMC, and the care they rendered is not challenged in plaintiffs' complaint. Under the language of subsection (e), both on its face and as interpreted by *Burger* and its progeny, the fact that litigation has been commenced would have no effect on the ability of the UCMC lawyers to conduct those interviews. Subsection (e) says that hospital staff members may communicate with legal counsel for the hospital "at any time" about the care or treatment they provided, and *Burger* held that a patient "cannot validly claim any greater expectation of privacy after the lawsuit is filed than prior to its filing." 759 N.E.2d at 555. Under that authority, the ability of the UCMC lawyers to conduct *ex parte* interviews would be constrained only by the Court's discretion "to enter protective orders when, under the particular circumstances of any given case, justice may so require." *In re Medical Malpractice Cases*, 787 N.E.2d at 244.

However, the development of Illinois law on this subject has continued. Effective January 1, 2004, the HLA was amended by the addition of subsection (e-5), which states as follows:

> Notwithstanding subsections (d) and (e), for actions filed on or after January 1, 2004, after a complaint for healing art malpractice is served upon the hospital or upon its agents or employees, members of the hospital's medical staff *who are not actual or alleged agents, employees, or apparent agents of the hospital* may not communicate with legal counsel for the hospital or with risk management of the hospital *concerning the claim alleged in the complaint for healing art malpractice* against the hospital except with the patient's consent or in discovery authorized by the Code of Civil Procedure or the Supreme Court rules.

210 ILCS 85/6.17(e-5) (emphasis added). The prefatory language to subsection (e-5) –
"[n]otwithstanding subsections (d) and (e) – indicates the legislature's intent to impose some limit
on the broad scope of communications permitted by subsections (d) and (e) once litigation is filed.

### A.

Not surprisingly, the parties disagree as to what limitation is imposed. Their dispute centers
on the threshold question of how to interpret the language in subsection (e-5) that triggers any post-
suit limitations: the language prohibiting certain post-suit communications between a hospital's
lawyers and medical staff "who are not actual or alleged agents, employees, or apparent agents of
the hospital."

According to plaintiffs, this language means that a hospital's lawyers may not engage in *ex
parte* discussions with medical staff who are not agents or employees of the hospital at the time of
the proposed *ex parte* discussions. For its part, UCMC says that subsection (e-5) only bars post-suit
*ex parte* discussions with medical staff who were not agents or employees of the hospital at the time
they delivered medical care to the plaintiff. UCMC argues that it is irrelevant whether the persons
with whom it wishes to communicate on an *ex parte* basis continue to be agents or employees of the
hospital at the time of the proposed *ex parte* discussions.

The parties have not cited, and we have not independently found, any legislative history
explaining the purpose in enacting subsection (e-5) or any Illinois decisions interpreting this
subsection. So, we are left to consider the parties' competing interpretations of this provision
without guidance from those sources. We have concerns about each side's respective interpretation.

The UCMC interpretation does not fit comfortably with the statutory language of the HLA.
As amended, the statute prohibits certain post-suit communications between hospital defense counsel

9

and persons who "are" not employees and agents. The word "are" most naturally refers to the present tense and, read plainly, would auger for an interpretation that subsection (e-5) imposes limits on post-suit communications with persons who are not agents or employees of the hospital at the time of the proposed *ex parte* contact. But, UCMC's interpretation of subsection (e-5) is that it does not refer to the present tense status (that is, *are* the persons whom hospital counsel wish to interview on an *ex parte* basis employees or agents of the hospital at the time of the interview), but instead to past tense status (that is, *were* the persons whom hospital counsel wish to interview employees or agents of the hospital at the time of the relevant conduct).

We recognize that words in statutes are sometimes given meanings that are contrary to common parlance. *E.g., County of DuPage v. Illinois Labor Relations Bd.*, 900 N.E.2d 1095, 1102 (Ill. 2008) (omitting citations) (recognizing that "'and' is often used interchangeably with 'or,' the meaning determined by the context"). In deciding whether here the legislature used "are" to mean "were," we have no legislative history to guide us. Thus, we would have to determine the legislative intent from the words and phrases used in the statute "in light of other relevant provisions and the statute as a whole," in an effort to divine "the purpose behind the law and the evils sought to be remedied, as well as the consequences that would result from the law being construed one way or the other." *Id*. at 1101.

Those principles of statutory construction are instructive, as plaintiffs' proposed alternative interpretation has troublesome implications. Plaintiffs say that after suit has been filed, if the doctor whom a hospital wishes to interview is not presently an employee or agent of the hospital, the inquiry ends and any *ex parte* interview is absolutely forbidden. But, that interpretation would prohibit a hospital's attorney from interviewing *ex parte* a doctor (1) who cared for a patient while

10

an employee or agent of the hospital, (2) whose conduct in delivering that care is the basis for a suit against the hospital, even though the doctor is not a defendant, and (3) who at the time of the proposed interview no longer is an employee or agent of the hospital. That result would undermine (if not overrule) *Morgan*, which held that "when a patient seeks to hold a hospital vicariously liable for the conduct of a physician-employee, the hospital is entitled to speak *ex parte* with that physician." *Morgan*, 625 N.E.2d at 139. It also would run contrary to the *Morgan* court's reasoning that where a plaintiff seeks to hold a hospital liable for the acts of one its doctors, "the confidentiality of any medical information the physician may have learned during his allegedly negligent treatment of plaintiff" does not "outweigh[] the defendant's right to effectively defend itself and to unfettered communication 'with the physician for whose conduct the hospital is allegedly liable.'" *Id.* at 142. We are reluctant to adopt an interpretation of subsection (e-5) that attributes to the legislature an intent, *sub silentio*, to make such a profound change in well-settled Illinois law.

**B.**

All of that said, we need not – and thus do not – resolve this thorny question of interpretation to decide the present motion. That is because we conclude that in this particular case, subsection (e-5) does not bar the requested *ex parte* interviews irrespective of whether the relevant time for determining agency of employment status is the time of the *conduct* or the time of the proposed *ex parte contact*.

If UCMC is correct, and the relevant time period for determining when Drs. Claud, Kohrman and Marcucelli were employees or agents of the hospital is the time when they rendered care to E.Y. in April 2005, then subsection (e-5) would not apply here at all. The affidavit that UCMC has submitted (Def.'s Reply, Ex. A, ¶ 3) establishes that these doctors all were agents of the hospital in

2005. If a doctor was an employee or agent of the hospital at the relevant time period, then subsection (e-5) does not in any way limit the scope of communications that the doctor may have with hospital counsel, pursuant to subsections (d) and (e), about the care delivered to the patient.

If plaintiff is correct, and the relevant time period for determining the employment or agency status of Drs. Claud, Kohrman and Marcucelli is the time when UCMC's lawyers wish to interview them, then subsection (e-5) would apply. In their response to UCMC's motion, plaintiffs raised a question as to whether the three doctors remain employees or agents of the hospital (Pls.' Resp. at 7-8). As a result, the Court ordered that in its reply memorandum, UCMC address "whether the doctors in question were employees or agents of the University of Chicago Medical Center at the relevant time" (doc. # 57: 02/07/12 Order). In its response, UCMC offered evidence showing that the doctors were employees or agents at the time they cared for E.Y. in April 2005 (the time that UCMC says is relevant for purposes of subsection (e-5)). But, UCMC was silent on the question of whether they remain employees or agents now, when UCMC seeks to interview them (the time that plaintiffs say is relevant under subsection (e-5)). In light of the Court's order that UCMC provide evidence of the employment or agency status of Drs. Claud, Kohrman and Marcucelli, we treat for purposes of this motion UCMC's failure to show that they currently are agents or employees as proof that they are not.

However, even where it applies, subsection (e-5) does not bar any and all *ex parte* interviews with doctors who are not employees or agents of the hospital at the relevant time. Rather, subsection (e-5) only prohibits those doctors from discussing with legal counsel for the hospital those matters "concerning the claim alleged in the complaint for healing art malpractice." In this case, Drs. Claud, Kohrman and Marcucelli are non-*Morgan* treaters; plaintiffs' claim of malpractice does not concern

12

their conduct in providing care to E.Y. *after* birth. To the contrary, the malpractice claim alleged in the complaint concerns the conduct of other doctors involved in prenatal care and in the delivery of E.Y. There is nothing in subsection (e-5) that limits the ability of hospital counsel to interview those doctors, *ex parte*, so long as the interview does not concern the conduct of others that forms the basis for plaintiffs' malpractice claim. As a result, the broader authority under the HLA for hospital's attorneys to talk with the hospitals agents or employees who cared for patients "at any time and in any fashion," about the "any care or treatment they provided," authorizes the *ex parte* interviews that UCMC seeks. The UCMC attorneys may interview Drs. Claud, Kohrman and Marcucelli about the care they gave to E.Y. and their observations of her condition. However, the UCMC attorneys may not interview those doctors about any observations or opinions (assuming they have any) about the care provided – or not provided – by others during the prenatal period or the delivery of E.Y., as that would tread on matters concerning the claim for malpractice.

This result gives effect to all aspects of the HLA. The HLA states that patient information obtained by the hospital staff "shall be the property of the hospital" and protected from "inappropriate disclosure" (subsection (b)). Prior to the filing of a lawsuit, under subsections (d) and (e), there is nothing inappropriate about the hospital's counsel discussing that information with the hospital's medical staff. There is no invasion of a patient's reasonable expectation of privacy because "[t]he hospital is not a third party with respect to its own medical information, which is compiled by the hospital's own caregivers." *Burger*, 759 N.E.2d at 555.

At the same time, we give effect to the evident legislative intent when enacting subsection (e-5): to override the *Burger* court's interpretation of the HLA that a patient "cannot validly claim any greater expectation of privacy after the lawsuit is filed than prior to its filing." *Burger, id.*

Subsection (e-5) adjusts the privacy-disclosure balance, not by categorically barring all post-suit interviews by hospital defense counsel with persons who are not employees or agents of the hospital at the relevant time, but rather by limiting the scope of those interviews to those matters that do not "concern[] the claim alleged in the complaint" for malpractice. The interviews the hospital wishes to conduct here of non-*Morgan* doctors, whose conduct does not concern the claim of malpractice, and does not intrude on the privacy interest created by subsection (e-5).

### III.

Having found that the HLA does not prohibit the requested interviews, we now consider other arguments raised by plaintiffs to bar them. We already have addressed, and rejected, one of those arguments: that the interviews should not be permitted because Drs. Claud, Kohrman and Marcucelli are not currently employees or agents of UCMC (Pls.' Resp. at 7-8).

Plaintiffs raise three other arguments in support of their position that the interviews should be prohibited: (1) that defendants can obtain the information they seek *ex parte* through the formal discovery process (Pls.' Resp. at 9-11); (2) that defense counsel's dual representation of UCMC and certain UCMC physicians and nurses prohibits *ex parte* communication with any of plaintiff's treating physicians under the HLA (*id.* at 8-9); and (3) that, at a minimum, the UCMC attorneys should be barred from having *ex parte* communications with Dr. Kohrman, who continues to treat E.Y. (*id.* at 11-12). We address each of those arguments in turn.

### A.

Plaintiffs argue that the information UCMC seeks to obtain through *ex parte* communications with the non-Morgan treating physicians can be more properly obtained through formal discovery processes (Pls.' Resp. at 10-11). Plaintiff asserts that a court's decision to permit *ex parte*

14

communications "involves balancing the sanctity of the physician-patient relationship with the [d]efendant hospital's need for the information to prepare its defense" (*Id.,* at 10).

We agree that this balance needs to be struck, but we disagree with the plaintiffs that this is done on a case by case basis. As explained above, that balancing already has been struck on a more categorical basis by the HLA and the case law interpreting it. Where, as in *Petrillo*, there is an effort to expose patient information to a third party, the interest in preserving the confidential relationship between a patient and physician is at its greatest, and "demands that information confidential in nature remain, absent patient consent, undisclosed to third parties. If such were not the case, then no confidentiality between a patient and his physician in fact would exist." *Petrillo,* 499 N.E.2d at 959. A defendant's desire to obtain that information does not trump that interest, since any information obtained through an *ex parte* discussion also could be secured through "conventional methods of discovery." *Id.* at 956.

By contrast, the HLA strikes the balance differently when a hospital's attorney seeks to interview *ex parte* those persons on its staff who were involved in providing care to a patient. In that scenario, unlike in *Petrillo*, "[t]he hospital is not a third party with respect to its own medical information, which is compiled by the hospital's own caregivers." *Burger,* 759 N.E.2d at 555. Thus, under HLA, a hospital's lawyers may talk with hospital staff who delivered care to a patient. Prior to suit, they may do so without limitation with respect to matters "concerning . . . any care or treatment they provided or assisted in providing to any patient" (subsection (e)). Under subsection (e-5), the hospital's defense counsel may continue to do so after a suit is filed, if the doctors whom they wish to interview are employees or agents at the relevant time. If the doctors are not employees or agents at the relevant time, the hospital's defense lawyers still may speak with the doctors, but

they may do so only on matters that do not "concern[] the claim alleged in the complaint for healing art malpractice."

Given the structure of the HLA and the relevant case law, it is not enough for plaintiffs to say that the *ex parte* interviews are unnecessary because the information they would yield could be obtained in discovery. That argument proves too much, since it is one that would apply in every case. Thus, if accepted, that argument would render a nullity the right afforded by the HLA and the case law of a hospital's attorneys defending a suit to speak with the staff who cared for the hospital's patients. We decline plaintiffs' invitation to adopt a result so at odds with the prevailing law.

**B.**

Plaintiffs also argue that defense counsel's dual representation of the hospital and the individual treating doctor and nurse defendants should bar counsel from interviewing *ex parte* Drs. Claud, Kohrman and Marcucelli (Pls.' Resp. at 8-9). Plaintiff argues that, unless UCMC "retains separate counsel" from the individual treating physicians and nurses named as parties in the underlying action, any *ex parte* communications would "side step" the *Petrillo* doctrine by permitting the defense counsel for the individual treating doctors and nurses to obtain privileged information about the patient, E.Y., that defense counsel would not otherwise be able to obtain under the HLA (Pls.' Resp. at 9).

We disagree. Plaintiffs have cited no case law or other authority supporting their position that an attorney's dual representation of a hospital and physicians whose conduct is at issue in a lawsuit bars the attorney from having *ex parte* conversations with non-*Morgan* doctors who rendered treatment to the patient. Moreover, we find plaintiffs' argument at odds with the HLA. Under subsection (b) of the HLA, "information regarding a hospital patient gathered by the hospital's

16

medical staff and its agents and employees shall be the property and responsibility of the hospital and must be protected from inappropriate disclosure . . . ." The three doctors in question here, as well as the doctors and nurses whom UCMC's counsel represents, all provided care to E.Y. as agents of UCMC. The "dual representation" that plaintiffs criticize does not create a risk that defense counsel would obtain confidential patient information and share it with strangers to the physician-patient relationship; to the contrary, the hospital itself is a part of that relationship. Thus, we conclude that the "dual representation" does not bar UCMC's attorneys from having *ex parte* conversations with Drs. Claud, Kohrman or Marcucelli.

### C.

Finally, plaintiffs argue that, at a minimum, UCMC's counsel should be barred from having *ex parte* communications with Dr. Kohrman, the non-*Morgan* treating physician who not only treated E.Y. in April 2005, but who also continues to do so to this day. We agree that as a result of his continuing treatment of E.Y., Dr. Kohrman is on a different footing than are Drs. Claud and Marcucelli.

To be sure, as a result of his treatment of E.Y. as an agent of the hospital in April 2005, Dr. Kohrman – like Drs. Claud and Marcucelli – is privy to information that, under the HLA, is the property of UCMC (*see* subsection (b)). As we have explained, it would not violate any legitimate expectation of privacy that plaintiffs may have for UCMC counsel to have *ex parte* discussions with any of those three doctors about their treatment of E.Y. while they worked for UCMC in April 2005.

But Dr. Kohrman wears a hat that distinguishes him from Drs. Claud and Marcucelli. He continued to treat E.Y. after April 2005, and UCMC does not argue or offer evidence to show that Dr. Kohrman rendered this continuing treatment as an agent of UCMC. The confidential

17

information to which Dr. Kohrman is privy as a result of that continuing treatment of E.Y. is not the property of UCMC; nor is it information to which UCMC is privy. Rather, with respect to Dr. Kohrman's treatment of E.Y. when Dr. Kohrman did not act as an agent for the hospital, UCMC is just as much a third party as was Syntrex's counsel who sought to have *ex parte* conversations with the plaintiff's doctor in *Petrillo*. As to information regarding that treatment, the public policy concern for protecting the confidential physician-patient relationship at the core of *Petrillo* applies with full force.

In opposing plaintiffs' argument regarding Dr. Kohrman, UCMC rests on the proposition that patients have a "reduced expectation of privacy with respect to communication of their hospital medical information within the hospital setting." *Burger,* 759 N.E.2d at 553. However, UCMC fails to come to grips with the dual nature of Dr. Kohrman's knowledge of plaintiff E.Y. Some of that knowledge was obtained while Dr. Kohrman treated E.Y. as an agent of the hospital in April 2005; but, other knowledge was obtained as a result of Dr. Kohrman's treatment of E.Y. while not an agent of the hospital. UCMC offers no explanation as to why plaintiffs lack a reasonable expectation of privacy as to the information Dr. Kohrman obtained through his treatment of E.Y. after he no longer was an agent of UCMC.

We conclude that this presents a situation appropriate for the Court's exercise of the discretion recognized in *Burger* to enter a protective order barring *ex parte* communications between UCMC's counsel and Dr. Kohrman. We recognize that *ex parte* communications between defense counsel and Dr. Kohrman would be permitted under subsections (d) and (e) so long as they focused on the treatment in April 2005. However, we are concerned, as a practical matter, about the ability of a doctor who has continuously treated E.Y. since April 2005 to draw a neat line separating what

18

he knows from the treatment during April 2005 and what he learned thereafter. In order to ensure that the information about Dr. Kohrman's treatment of E.Y. to which UCMC is a third party remains confidential to the physician-patient relationship between Dr. Kohrman and E.Y., we bar UCMC counsel from having *ex parte* discussions with Dr. Kohrman.

## CONCLUSION

For the reasons stated, the Court grants in part and denies in part UCMC's motion to conduct *ex parte* interviews with E.Y.'s non-*Morgan* treating physicians (doc. #54). We authorize UCMC's counsel to conduct *ex parte* interviews with Drs. Claud and Marcucelli, but we enter a protective order barring UCMC counsel from conducting any *ex parte* interviews with Dr. Kohrman.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: April 26, 2012

19