IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| E.Y., a Minor, by his Mother and Next Friend, Tenille Wallace, and TENILLE WALLACE, individually, | ) ) ) ) | |
| Plaintiffs, | ) ) | No.  10 C 7346 |
| v. | ) ) | Judge Robert W. Gettleman |
| THE UNITED STATES OF AMERICA, UNIVERSITY OF CHICAGO, CATHERINE HARTH, M.D., KENNETH R. MACEK, M.D., NATASHA JENKINS, M.D., KRISTINE WROBLEWSKI, R.N., and SHERLEY MCCLAIN, R.N., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On August 25, 2011, Plaintiffs E.Y., a minor, by his mother and next friend, Tenille Wallace, and Tenille Wallace, individually, filed their second amended complaint for damages in this medical malpractice action under the Federal Tort Claims Act, 28 U.S.C. § 2671 ("FTCA"), and the Family Expense Act, 750 ILL. COMP. STAT. 65/15, against defendants United States of America, the University of Chicago, and six individuals.[1]  On February 4, 2013, defendant United States ("the government") moved for summary judgment on sovereign immunity grounds.  In the course of briefing, plaintiffs also filed a motion to strike the government's Rule 56.1 statement of facts and a supporting declaration.  For the reasons described below, the court grants the government's motion for summary judgment and denies plaintiffs' motion to strike.

---

[1]On February 28, 2012, plaintiffs moved to voluntarily dismiss defendant Sharosh Rana, M.D., from the suit.

**BACKGROUND**[2]

On November 4, 2004, then-20-year-old plaintiff Tenille Wallace ("Tenille") first received medical care for her first pregnancy at the federally funded Friend Family Health Center, Inc. ("Center") and was treated by Dr. Nana Biney, M.D. On March 29, 2005, Tenille presented at the Center for a prenatal visit with elevated blood pressure, complaining of face and hand edema and visual changes. Tenille was evaluated and treated by Dr. Biney, who requested that she have prolonged fetal monitoring in labor and delivery and that she return to the clinic in one week. Tenille, however, did not receive the prolonged fetal monitoring when she went into labor on April 4, 2005, and was taken to the University of Chicago Hospital ("Hospital"). Minor plaintiff E.Y. was delivered by C-section because of "non-reassuring fetal monitor strips." At the time of E.Y.'s birth, Tenille knew something was wrong because E.Y. was delivered looking "purple and limp," and within days thereafter a doctor told her that E.Y. had been deprived of some oxygen during delivery. Since then, Tenille, as the parent of E.Y., became obligated for various hospital and medical expenses resulting from E.Y.'s anoxic brain injury under the Family Expense Act, 750 ILL. COMP. STAT. 65/15.

---

[2]The following facts are, unless otherwise specified, undisputed and come from the parties' L.R. 56.1 statements. Plaintiffs have moved to strike the government's LR 56.1 statement and the supporting declaration of Dr. Ivy Cobbins, Ed.D. on the grounds that the government's submission contains improper compound assertions, unsupported conclusions, characterizations, inferences, inferences drawn in its favor, over-broad citations and inadmissible evidence. It is within the court's discretion to strike any paragraphs that do not conform with Rule 56. Little v. Cox's Supermarkets, 71 F.3d 637, 641 (7th Cir. 1995). The court denies plaintiffs' motion to strike ¶¶ 2, 6, 8, 9, 10, 18, and 22 for compound assertions because the paragraphs are not so long or complicated as to impair plaintiff's ability to respond. The court also denies plaintiff's motion to strike ¶¶ 1, 2, 8, 9, 17, 18, 19, 22, 25, and 28 for argumentative characterizations.

On May 9, 2006, Dr. Lisa Thornton examined E.Y. and diagnosed the child with "diplegic cerebral palsy." Dr. Thornton explained the diagnosis to Tenille. After her consultation with Dr. Thornton, Tenille spoke with her uncle, Phillip Beth, an attorney licensed in Illinois. Beth suggested that Tenille speak to a lawyer regarding E.Y. and the circumstances surrounding his birth, explaining that she might have a case. Specifically, Beth referred Tenille to the Clifford Law Office ("CLO").[3] Tenille admits that she delayed in contacting CLO for months because of her hesitation to get involved in legal proceedings.

Tenille eventually contacted CLO by telephone in late October or early November 2006. In mid November 2006, Tenille first met with an attorney from CLO to discuss her potential case. By Tenille's own admission, she believed she had a case against her doctors when she initially consulted CLO. Tenille met with CLO attorneys on a second unknown date, where she signed a representation agreement and a release for her medical records. Subsequent to that meeting, on November 28, 2006, plaintiffs' counsel requested a complete copy of plaintiffs' records from the Center and the Hospital.

On December 14, 2006, plaintiffs' counsel received a partial set of prenatal records from the Center. Plaintiffs' counsel continued to request a full set of medical records from the Center and Hospital. In May 2007, plaintiffs' counsel received a set of partial Hospital records. In October 2007, plaintiffs' counsel received additional prenatal records from the Center, and in

---

[3]The government alleges that Tenille first consulted her uncle a couple of months after E.Y.'s birth, on or around June 2005. Plaintiffs maintain that Tenille's first consultation with her uncle was in May 2006, but also claim that she waited months – "probably even . . . a year" after her conversation with her uncle to contact CLO. The parties agree that Tenille contacted CLO in late October or early November 2006. Regardless of the exact date of the first conversation, it is uncontested that by May 2006, Tenille had spoken to her uncle about legal representation.

January 2008, plaintiffs' counsel received Tenille's April 5, 2005 fetal monitor strips from the Hospital.

On December 10, 2008, plaintiffs filed suit in the Circuit Court of Cook County. The government removed the case to federal court on that same day, and filed a motion to dismiss for failure to exhaust administrative remedies. Within 60 days of dismissal of the state court action, plaintiffs presented their claims to the Department of Health and Human Services. Therefore, under 28 U.S.C. § 2679(d)(5), December 10, 2008, is the date on which plaintiffs' claims are deemed filed for statute of limitations purposes.

## DISCUSSION

In April 2011, the government moved to dismiss the complaint on statute of limitations grounds, but the motion was denied. E.Y. v. United States, 2011 WL 2604900 (N.D. Ill. June 29, 2011). This court found that, based on the facts alleged in the complaint, the earliest time plaintiffs' claims could have accrued was December 16, 2006, the date that plaintiffs' counsel received partial records from the Center. This date was within the relevant two year statute of limitations. The court determined that the receipt of medical records, in conjunction with Tenille's knowledge of her course of treatment, may have been sufficient to give Tenille the subjective belief of a government cause to E.Y.'s injury. The court determined that plaintiffs' claim had not accrued prior to December 10, 2006, because under Stoleson v. United States, 629 F.2d 1265, 1270 (7th Cir. 1980), Tenille's subjective belief that there was a possible government cause of E.Y.'s injury alone did not begin the accrual of the claims.

The government now moves for summary judgment on sovereign immunity grounds, arguing that plaintiffs' case is time-barred because they failed to file their claim, which is a

prerequisite to suit under the FTCA, within the two-year statute of limitations. The government argues that additional evidence has been developed in discovery regarding when plaintiffs' claim accrued, and that the Seventh Circuit has recently provided clarification regarding the standard for accrual dates.

**I.     Legal Standard**

Defendant has raised a statute of limitations defense in a motion for summary judgment, which renews the defense raised on a motion to dismiss. On a 12(b)(6) motion, plaintiff's factual allegations are taken as true and inferences are drawn in plaintiff's favor. In re marchFIRST Inc., 589 F.3d 901, 904 (7th Cir. 2009) (affirming 12(b)(6) dismissal on statute of limitations). If the face of the complaint nonetheless clearly demonstrates that the cause of action has not been brought within the statute of limitations, the motion to dismiss will be granted. Motor Carrier Audit and Collection Co., a Div. of Delta, 113 B.R. 424, 425 (N.D. Ill.1989). If further discovery regarding the accrual of a cause of action is warranted, a party may properly develop the record and move for summary judgment on statute of limitations grounds. Alioto v. Marshall Field's & Co., 77 F.3d 934, 937 (7th Cir. 1996).

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Unterreiner v. Volkswagen of Am., Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th

Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed.R.Civ.P. 56(c); Becker v. Tenenbaum–Hill Assocs., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services–Milwaukee Inc., 979 F.2d 1239, 1242 (7th Cir. 1992). Summary judgment may properly be entered on the basis of a statute of limitations defense if, "(1) the statute of limitations has run, thereby barring plaintiff's claim as a matter of law, and (2) there exist no genuine issues of material fact regarding the time at which plaintiff's claim has accrued and the application of the statute to plaintiff's claim which may be resolved in plaintiff's favor." Yorger v. Pittsburgh Corning Corp., 733 F.2d 1215, 1219 (7th Cir. 1984).

II.     **Accrual of the FTCA Claim**

The United States, as a sovereign entity, is generally immune from suit unless it has expressly consented. Federal Deposit Insurance Corp. v. Meyer, 510 U.S. 471, 475 (1994). The FTCA is a limited waiver of this immunity and allows individuals to bring suit against the government for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1); Warrum v. United States, 427 F.3d 1048, 1049 (7th Cir. 2005). Under the FTCA, however, a claimant is barred if he does not present his claim in writing to the appropriate agency within two years of the date on which his claim accrues. 28 U.S.C. §

2401(b); Jastremski v. United States, 737 F.2d 666, 669 (7th Cir. 1984).[4] Because plaintiffs' administrative claim is considered as having been filed on December 10, 2008, summary judgment for the government will be granted if the court determines that plaintiffs' claims accrued before December 10, 2006.

Federal law governs when a claim accrues under the FTCA, McCall v. United States, 310 F.3d 984, 987 (7th Cir. 2002), and the Seventh Circuit has held that a plaintiff's claim accrues when: "(A) the plaintiff discovers; or (B) a reasonable person in the plaintiff's position would have discovered that he has been injured by an act or omission attributable to the government." Arroyo v. United States, 656 F.3d 663, 668 (7th Cir. 2011) (collecting cases). The Seventh Circuit has, since 2011, issued a number of decisions clarifying this standard, including Arroyo and Arteaga v. United States, 711 F.3d 828, 832 (7th Cir. 2013) ("Arteaga II").

The court in Arroyo noted that, in FTCA cases, there are often multiple causes of a plaintiff's injury, and that determining the causes underlying a claimant's injury can be extremely complicated in medical malpractice cases. A court must engage in a two-part inquiry, comprised of both objective and subjective components, to determine "the first time the plaintiff knew, or a reasonably diligent person in the plaintiff's position, reacting to any suspicious circumstances of which he or she might have been aware, would have discovered that an act or omission attributable to the government could have caused his or her injury." Id. at 669.

---

[4] Although plaintiff E.Y. is a minor, the Seventh Circuit has held that a plaintiff's minority does not toll the FTCA statute of limitations because the minor's parents have a duty to sue on the child's behalf. McCall ex rel. Estate of Bess v. United States, 310 F.3d 984, 988 (7th Cir. 2002) ("[W]e now join our sister circuits and hold that the FTCA's statute of limitations is not tolled during the period of a putative plaintiff's minority.").

The Arroyo court also cautioned that accrual of a plaintiff's claim is not delayed until an individual acquires complete knowledge of the cause of his injury; "accrual occurs when an individual acquires information that would prompt a reasonable person to make 'a deeper inquiry into a potential [government-related] cause' of his or her injury." Id. at 669 (citing Nemmers v. United States, 795 F.2d 628, 632 (7th Cir. 1986)). In claims that involve medical malpractice, accrual is not postponed until a plaintiff learns that his injury is the result of a doctor's negligence. Id. at 672-73; U. S. v. Kubrick, 444 U.S. 111, 122-23, 100 S. Ct. 352, 359, 62 L. Ed. 2d 259 (1979) ("[F]or statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should [not] receive identical treatment . . . . We thus cannot hold that Congress intended that 'accrual' of a claim must await awareness by the plaintiff that his injury was negligently inflicted."). Once a plaintiff is "armed with the facts about the harm done to him, [he] can protect himself by seeking advice in the medical and legal community . . . [and to] excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute." Kubrick, 444 U.S. at 123. As this court stated previously in its June 29, 2011 order, the statute of limitations began to run when plaintiffs first knew that E.Y. had suffered a brain injury and that the government might have caused it.

The government argues that plaintiffs' claim accrued prior to December 10, 2006, and relies on additional facts developed in discovery that demonstrate that Tenille had sufficient information to discover that the Center was a potential cause of E.Y.'s injury before that date. The government also argues that the recent Arroyo and Arteaga II decisions provide guidance as to when a claim accrues.

8

Shortly after E.Y.'s birth, Tenille was aware that he was deprived of oxygen during the delivery. By May 2006, Dr. Thornton had diagnosed E.Y. with cerebral palsy. At this point, the parties agree that Tenille certainly knew that her son had been injured. According to the parties, by late November 2006, Tenille had consulted an attorney to investigate her claims and believed that she might have a case against the Hospital for E.Y.'s injuries.[5] The government argues that these actions were sufficient to meet the accrual standard, because plaintiffs had sufficient information to make an inquiry into a potential government-related cause of the injury.[6] Indeed, on November 28, 2006, plaintiffs' counsel requested a copy of Tenille's records from the Center (funded by the government) and the Hospital with the intention of investigating the claims.

---

[5] Tenille's admission in her deposition that she believed she had a case against the Hospital is one of the primary facts elicited in discovery that the government relies on in renewing its statute of limitations defense at the summary judgment stage.

[6] The government argues that Tenille might have had sufficient knowledge of her claim even earlier than November 2006. In 2003, Tenille was enrolled in Olive-Harvey College and took a number of classes that served as prerequisites for admission into the nursing program. The government points to Tenille's enrollment in Human Growth and Development 101. According to an affidavit from Dr. Cobbins, the professor of the course, the course curriculum would have included readings regarding prenatal care, birth problems, and the causes and effects of oxygen deprivation in the birthing process. The government relies on these assertions to support the claim that Tenille should have known that her prenatal care may have been the cause of T.Y.'s injuries as early as Fall 2005. The court rejects this argument. It is not clear from the record that Tenille did study these topics because Dr. Cobbins states only that it is "probably more true than not" that a required reading passage would have discussed oxygen deprivation at birth. Dr. Cobbins opines that the syllabus from 2011 is similar to the 2005 syllabus, but there is no certainty that Tenille read any relevant passage. Dr. Cobbins provided a sample reading; it is a short two-paragraph discussion of oxygen deprivation in a section on "Birth Problems." The court therefore finds that the record does not support the conclusion that Tenille had knowledge in the Fall of 2005 that the Clinic or the Hospital were potentially responsible for her child's injuries. For this reason, the court also denies plaintiff's motion to strike Dr. Cobbins' declaration as moot.

Plaintiffs argue that while Tenille did begin to investigate her claims against the Hospital by requesting records in November, she did not receive her complete records until January of 2008. They claim that although Tenille may have suspected that *Hospital* employees may have played a part in her son's injury, she did not have any reason to suspect that her prenatal care provider, the federally funded *Center*, might have played a role. Therefore, plaintiffs argue, Tenille was not aware of any government cause of E.Y.'s injury, and the FTCA claim did not accrue until she received her records from the Center.

Plaintiffs also argue, citing Gould v. United States, 684 F.Supp. 508 (N.D. Ill.1988), and Stoleson, which this court cited in its previous decision, that Tenille's subjective belief that there was a potential doctor-related cause to E.Y.'s injury is insufficient to trigger the accrual of claims. Recent Seventh Circuit decisions, however, have cast doubt on the applicability of Stoleson in this case.

In Stoleson, the Seventh Circuit held that the plaintiff's FTCA claim was tolled until a medical professional confirmed that exposure to nitroglycerin at her government job could have caused her injuries. The facts of Stoleson are unique because the causal connection between nitroglycerin exposure and heart problems was not known prior to the investigation by the doctor the plaintiff had consulted. The plaintiff had no knowledge that her injury might have been caused by the government; medical science had not yet reached that theory. Stoleson, 629 F.2d at 1270-71.

In Gould, the plaintiff's son had been diagnosed with hyperactive, behavioral, and neurological problems after birth, but for ten years evaluating physicians were unable to determine the cause of the child's condition. When a physician finally suggested a doctor-related

10

cause, the plaintiff's claim accrued. Prior to that suggestion, the plaintiff had no knowledge that government negligence could have caused the child's injury.

The Seventh Circuit subsequently qualified the language in Stoleson on which plaintiffs rely. In Nemmers, the court added that "a 'layman's subjective belief' in a cause does not start the statute *when a competent medical professional would disagree with the belief.*" 795 F.2d at 631 (quoting Stoleson, 629 F.2d at 1270) (emphasis added). Language in Arroyo also indicates that Stoleson presented a unique case; the court clarified that the standard for FTCA accrual requires "mere knowledge of the potential existence of a governmental cause . . . to start the clock ticking." 656 F.3d at 669. Other courts in this district have likewise recognized the limited value of Stoleson and distinguished cases on the factual differences. See Arteaga v. United States, 10 C 7767, 2012 WL 32983, at *8 (N.D. Ill. Jan. 6, 2012) (Arteaga I) aff'd, 711 F.3d 828 (7th Cir. 2013).

The instant case is also distinguishable from Stoleson and Gould. Plaintiffs did not have to wait for medical science to reveal a potential cause to E.Y.'s injury. The fact that oxygen deprivation at birth may be the result of negligent prenatal care or negligence at delivery is not emerging science. See Nemmers, 795 F.3d at 630 (discussing prenatal and birthing negligence as a potential cause of cerebral palsy); cf. Arteaga I, 2012 WL 32983, at *8 (distinguishing Stoleson from the plaintiff's injuries because the plaintiff's injuries were "common and widely understood). Tenille did not have baseless suspicions that prompted her to consult an attorney regarding her claims. Although she did not yet have the medical records to substantiate the claims, she knew in May 2006 that it was possible that there was a doctor-related cause to her child's injuries. The fact that her belief that she had a case against the Hospital was yet

unconfirmed does not mean her claim had not yet accrued. See Arteaga I, 2012 WL 32983, at *8.

Whether the date of accrual was prior to December 10, 2006, or after that date therefore depends on the question of whether it was sufficient that plaintiff knew of a potential iatrogenic (doctor-related) cause of her injury related to her treatment during pregnancy and delivery, or whether she needed to know specifically of the Center's potential involvement. The government argues that the recent decisions in Arroyo, Arteaga II, and A.Q.C. ex rel. Castillo v. United States, 656 F.3d 135 (2d Cir. 2011), demonstrate that plaintiff need only know of a potential iatrogenic cause of the injury for the claim to accrue. In Arroyo, the Seventh Circuit refused to accept the government's broader contention that "all reasonable persons who suffer injuries while under the care of medical professionals [should] assume that their injuries can be attributed to shortcomings in the care they received." Arroyo, 656 F.3d at 671. Instead, the court reaffirmed that a plaintiff's claim "only accrues when he obtains sufficient knowledge of the government-related cause of his injury." Id. at 672.

According to the government, the Arroyo court used the phrase "government-related cause" to contrast with the "biological cause" of the injury. The government argues that because the doctors involved Arroyo were all employed by the government, the court had no need to distinguish between terms "government-related cause" and the "iatrogenic cause," and that "government-related cause" is essentially a synonym for "iatrogenic cause." Once a plaintiff becomes aware that the injury sustained was not a natural biological complication, but instead involved some other cause, the government argues that a plaintiff has enough knowledge to begin to pursue her claim. Thus, when one iatrogenic cause accrues, a plaintiff's claim against

all doctors involved in her treatment accrues, and plaintiffs may use the statutory two-year period to investigate which particular doctor to bring their claims against. To hold otherwise, the government argues, would be to extend the statute of limitations period for each doctor until a medical-legal expert validates a claim against each individual doctor, a result clearly contrary to the strict terms of the FTCA waiver of immunity. See United States v. Shaw, 478 U.S. 310, 318, 106 S. Ct. 2957, 92 L. Ed. 2d 250 (1986), superceded by statute on other grounds as noted in Landgraf v. USI Film Products, 511 U.S. 244, 287, 114 S. Ct. 1522, 128 L. Ed. 2d 229 (1994).

In the same vein, the government cites the recent Seventh Circuit opinion in Arteaga II, where the court rejected the plaintiff's argument that her claim did not accrue until she learned that her doctors could be sued only under the FTCA. The Arteaga court held that precedent "require[s] knowledge only of injury and of the likely cause of the injury to start the statute of limitations running, [and] that armed with such knowledge the prospective plaintiff should be able to discover within the statutory limitations period the rest of the facts needed for drafting a complaint that will withstand a motion to dismiss." Id. at 832. This language, the government argues, reinforces the idea that the claim accrues when a plaintiff suspects a non-biological cause to the injury. The subsequent two-year statute of limitations period allows for a plaintiff to diligently investigate which of the involved doctors and care providers might have contributed to the injury, along with other relevant facts.

Finally, the government cites A.Q.C., where the Second Circuit analyzed the accrual of a medical malpractice claim in connection with an injury sustained at birth. In A.Q.C., the court explicitly held that "any claim related to that injury accrued once [plaintiff] had reason to suspect that [her child's] injury was iatrogenic." 656 F.3d at 140. The court further stated that by the

13

time the plaintiff had contacted an attorney regarding her child's injury, her claim had accrued because she was aware of the need to inquire to protect her legal rights. According to the court, "[f]rom that point, she and her lawyers had ample time to investigate the case and determine whether, against whom, and in what forum to bring a malpractice action." Id. at 144. The court rejected the plaintiff's proposed rule of waiting until the attorneys obtained and reviewed the medical records, because the plaintiff's attorney would be able to set the accrual date of her claim to coincide with their litigation strategy, thereby frustrating the purpose of the statute of limitations.

To bolster this line of interpretation, the government points to Seventh Circuit cases where courts drew a line between biological and iatrogenic causes, and determined accrual based on knowledge of the iatrogenic cause. The government highlights Nemmers, 795 F.2d at 629–32, where the court explained that the plaintiff mother's knowledge of her unusually difficult delivery as a cause was insufficient to begin the running of the statute of limitations, and that "accrual only occurred upon her learning that her doctor's actions might also have contributed to her child's injury." In Drazan v. United States, 762 F.2d 56, 59 (7th Cir. 1985), the court differentiated between the biological cause of lung cancer and the iatrogenic cause of the government hospital's failure to follow up on the results of an x-ray examination. The Drazan court stated that "[t]he notice must be not of harm but of iatrogenic harm, though, as Kubrick holds, not necessarily of negligent iatrogenic harm." Id. The Drazan language therefore conforms with the government's interpretation that suspicion of a non-biological cause triggers the accrual of a claim.

In response, plaintiffs counter that the cases cited by the government do not suggest that the courts intended the phrases iatrogenic and government-related to be used interchangeably where multiple iatrogenic causes are possible. Plaintiffs point to language in <u>Arroyo</u> stating that, in cases with multiple causes for a plaintiff's injury, the FTCA claim accrues "only when the individual knows (or should have known) of the 'cause that is in the government's control, not a concurrent but independent cause that would not lead anyone to suspect that the government had been responsible for the injury.'" 656 F.3d at 688 (citing <u>Drazan</u>, 762 F.2d at 59). Plaintiff also notes further statements from the <u>Arroyo</u> and <u>Drazan</u> courts "that a plaintiff's knowledge of the non-governmental causes of his injury is insufficient to start the statute of limitations running on his FTCA claim. It is only when a plaintiff obtains sufficient knowledge of the government-related cause of his injury that his claim accrues." <u>Id</u>. (citing <u>Drazan</u>, 762 F.2d at 59). Plaintiff argues that in cases where there are multiple potential causes, a plaintiff's claims against the government do not accrue because the plaintiff discovers other potential causes of her injuries; instead the plaintiff must discover or have reasons to suspect the government cause specifically.

None of the cases cited by either party concern an injury with multiple potential iatrogenic causes, some government-related and some private. The Seventh Circuit, however, has provided some guidance about a plaintiff's responsibilities when faced with multiple potential causes. In <u>Fries v. Chicago & Nw. Transp. Co.</u>, 909 F.2d 1092, 1095 (7th Cir. 1990), a case that analyzed the accrual of a claim under the Federal Employers Liability Act, 45 U.S.C. §§ 51-60, the court relied on <u>Kubrick</u>, <u>Nemmers</u>, and <u>Drazan</u> in concluding that,

> "the injured plaintiff need not be certain which cause, if many are possible, is the governing cause but only need know or have reason to know of a potential cause.

> Nemmers, at 631-32; Drazan, 762 F.2d at 59. That this rule imposes on injured plaintiffs an affirmative duty to investigate the potential cause of his injury has not been lost on the courts. However, to apply any other rule would thwart the purposes of repose statutes which are designed to apportion the consequences of time between plaintiff and defendant, Nemmers, at 632, and to preclude litigation of stale claims."

Having reviewed the above-cited cases, the court finds that under Seventh Circuit precedent the accrual of an FTCA claim is not delayed until a plaintiff can discover which of the various doctors involved in her treatment is potentially responsible for an injury. Arroyo, Nemmers, and Arteaga demonstrate that once a plaintiff becomes aware that the injury sustained does not have a natural cause and identifies the potential doctors involved, plaintiff is on notice that she may have a claim. The date when a claim accrues and when a plaintiff has sufficient information to file a complaint should not be conflated. The cited decisions make it clear that accrual is not postponed until the plaintiff begins to develop the contours of her claim or determines whether the evidence is sufficient for a favorable outcome.

Likewise, knowledge of one's legal rights is not necessary; it is well-settled that accrual is not delayed until a plaintiff determines that a doctor was negligent. A plaintiff need not be armed with facts enough to file a complaint, but rather must essentially be on notice to begin investigating her claim. The subsequent two year limitations period allows for this inquiry, and for the gathering of facts necessary to file suit. Delaying accrual until a plaintiff may parse out which actor involved in her treatment holds legal responsibility would therefore be contrary to precedent. Such a holding would allow staggered accrual dates of claims against the various doctors, delaying accrual through the discovery process until potential negligence could be confirmed, and essentially expanding the statute of limitations period. Once a plaintiff has

knowledge of her injury and has identified the potential universe of treatment providers who may have been the source of her injury, her claim against those providers accrues.

In the instant case, plaintiffs' claims accrued prior to December 10, 2006. By late November 2006, Tenille had knowledge that her child had suffered an injury because E.Y. had been diagnosed with cerebral palsy by Dr. Thornton in May 2006. Soon after, Tenille's uncle (an atorney) advised her that she might have a case against the Hospital doctors, and Tenille sought legal counsel beginning in late October 2006 or early November 2006. Tenille herself admits that she believed she had a case against the Hospital, and thus that E.Y.'s injuries were doctor-caused. Tenille's request for medical records, however, was not confined to the Hospital; she requested her medical records from the Center, which indicates that she understood that the actions of the Center doctors could be related to E.Y.'s injuries. The Center doctors where therefore part of the identified potential universe of treatment providers that may have acted negligently. Under the standards articulated by the Seventh Circuit in <u>Arroyo</u>, Tenille had acquired information that prompted her to make a deeper inquiry into the potential government-related cause of her injury and reacted to those "suspicious circumstances." By late November 2006, when Tenille began to investigate her claims by requesting medical records, her claims against her doctors had accrued. She then had two years to complete that investigation and file her claim against the proper parties. Because her claims accrued over two years before her action was deemed filed, the court grants the government's motion for summary judgment.

It should be noted, however, that the court does not approve of the sweeping language of the government's position. To suggest that once a plaintiff learns of one doctor's potential

17

involvement, her claims begins to run against any and all doctors who provided treatment erodes the knowledge requirement that the Seventh Circuit has staunchly upheld in <u>Arteaga</u> and <u>Arroyo</u>. <u>See</u> <u>Arroyo,</u> 656 F.3d at 672 ("A rule that forces patients to scour their records whenever they receive medical treatment and to initiate preemptive litigation is inequitable, inefficient and—most importantly—contrary to the commonsensical intuitions that "reasonable man" tests are supposed to embody.") A plaintiff must have a suspicion that the government doctor was in the universe of potential doctors who might have provided negligent care that contributed to her injury. As described above, Tenille's knowledge that the Center doctors were potentially involved in E.Y.'s injury is confirmed by her request for her medical records from the Center. Once Tenille identified the Center as a potential cause of her injury, she had the knowledge necessary to begin to investigate her claim. The record demonstrates that Tenille suspected an irregularity in the birthing process and potential negligence on the part of the Hospital doctors. But the record also reflects that Tenille understood that the actions of the Center's doctors could have contributed to her son's injury.

To apply the government's broad standard outside the facts of this case could lead to inequitable results. For example, if Tenille had visited a third doctor early in her pregnancy who provided some treatment unrelated to her pregnancy that could have contributed to E.Y.'s injury, but Tenille had no reason to suspect that treatment as a potential cause and did not request any records from the third doctor, her claim against that doctor would not have accrued. There would be no guarantee that, in this hypothetical situation, Tenille would have discovered the third doctor's negligence while investigating her claims against the Center and the Hospital. A reasonable person would not have the information necessary, at that point, to suspect that third

doctor's treatment was a potential cause. The government's proposed rule would require plaintiff's to "scour their records," without any temporal restriction, to discern whether there was any medical possibility that any medical treatment received could have indirectly contributed to plaintiff's injury. The court therefore declines to adopt the government's interpretation of the accrual standard.

## CONCLUSION

For the reasons stated above, the court grants the government's motion for summary judgment. A status date is set for July 10, 2013, at 9:00 a.m.[7]


**ENTER:** July 2, 2013

_____
**Robert W. Gettleman**
**United States District Judge**

---

[7]The court notes that absent the government, there appears to be no basis for federal jurisdiction. The parties are requested to be prepared to address this issue at the July 10 status hearing.